Filed 4/14/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| JACK BENETATOS et al., | B253491 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS141016) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert H. O'Brien, Judge. Affirmed.

Jeffer Mangels Butler & Mitchell, Benjamin M. Reznik, Matthew D. Hinks for Plaintiffs and Appellants Jack Benetatos and Nick Benetatos.

Michael N. Feuer, City Attorney, Terry P. Kaufmann-Macias, Assistant City Attorney, Amy Brothers, Deputy City Attorney for Defendant and Respondent.

**INTRODUCTION**

Plaintiffs and appellants Jack Benetatos and his son Nick Benetatos (plaintiffs) own and operate Tam's Burgers No. 6 (Tam's), a fast food restaurant in Los Angeles. They appeal from the trial court's denial of their petition for writ of mandate that sought to overturn defendant and respondent City of Los Angeles's (City) determination that plaintiffs operated Tam's in a manner that constituted a nuisance and the City's imposition of conditions on the continued operation of Tam's. Plaintiffs argue that the de novo standard of review applies and that the trial court erred because the conditions at issue were caused by Tam's being in a high crime area. In affirming the judgment, we hold that the substantial evidence standard of review applies and that there is substantial evidence in support of the administrative determination that plaintiffs' operation of the restaurant rendered it a nuisance.

**BACKGROUND**

**I.      The City's Nuisance Investigation and Abatement Proceeding**

Tam's is located at 10023 and 10027 South Figueroa Street at the intersection of Figueroa and 101st Streets in Los Angeles. The site has a 12-space surface parking lot and is adjacent to residential homes. The restaurant has drive-through and walk-up windows.

By a letter dated November 23, 2011, the Los Angeles Police Department (LAPD) informed plaintiff Jack Benetatos that due to recent complaints about Tam's, it had initiated a preliminary nuisance investigation. The LAPD stated that the crime/nuisance" issues included, but were not limited to, "pimping-prostitution, narcotics use-sales, loitering, transients and intoxicated groups, drinking in public, graffiti and associated trash and debris that encourage loitering." It suggested conditions on the use of the property to mitigate the nuisance activities.

On April 17, 2012, the Los Angeles Department of City Planning (Planning Department) received a letter from LAPD Officer Mike Dickes concerning the abatement of a nuisance at Tam's. Officer Dickes stated, "The Southeast Area has been plagued by

2

this location for numerous years with the owner being uncooperative with mitigating the nuisance at his business." The officer provided a "brief description" of the issues with Tam's as follows: "1. Extensive calls for service and crime reports at the location, including two homicides in the last two years and a narcotics arrest involving an employee. [¶] 2. Loitering to [*sic*] including transients, gang, prostitution and narcotic offenders. [¶] 3. Building is dilapidated and lot is full of trash, debris and graffiti. [¶] 4. Owner was advised of the nuisance associated with the property and was provided with voluntary conditions as of Dec 2011. None of which have been complied with. [¶] 5. Owner has been uncooperative and will not meet physically with officers, stating that all criminal issues associated with the property are a police matter. . . . [¶] 6. Several citizen declarations involving people living in the area directly affected by the nuisance activity at the location with the file. [¶] 7. Location currently being monitored by 24 hour pole camera operated by the police department depicting the nuisance activity."

On June 5, 2012, a Planning Department investigator visited Tam's and prepared a report. The investigator reported that the site was not maintained—there was a "greaser" in the parking lot; rubbish throughout the property; and graffiti on the cement walls, menu signs, and building. The investigator asked the restaurant's manager why the property had not been maintained. The manager explained that criminal activity had been a problem in the area. He said that each time he painted over graffiti, new graffiti appeared within a couple of days. At some point, the manager decided to leave the graffiti because of the time and cost of addressing it.

In the report, the investigator stated that there had been community allegations about, and LAPD calls for service and arrest for, "criminal homicides, pimping-prostitution, narcotics use-sales, loitering, transients and intoxicated groups, drinking in public, graffiti and associated trash and debris that encourage loitering. . . . These activities are jeopardizing and/or endangering the public health and safety of persons residing or working on the premises or in the surrounding area, thereby constituting a public nuisance, and contributing to the deterioration of the adjacent community. The activities occurring in and around the premises have generated numerous police

3

responses thereby straining the resources of the Police Department." Between May 1, 2009, and February 13, 2012, the LAPD made 58 service calls to Tam's in response to complaints or reports. The crimes committed at Tam's between June 29, 2007, and January 3, 2011, included a misdemeanor battery, drinking in public, three drug offenses, pimping, two homicides, and two assaults with a deadly weapon.

On June 21, 2012, the Planning Department's Zoning Administrator held a hearing pursuant to Los Angeles Municipal Code section 12.27.1 (section 12.27.1)— "Administrative Nuisance Abatement Proceedings"—to determine whether Tam's, as operated, constituted a public nuisance and whether to impose conditions on its operation. At the hearing, plaintiffs testified[1] that they were at the restaurant five days a week; they could not control the nuisance activities outside the property; as soon as they removed graffiti, it reappeared; they always reported graffiti to the LAPD, but the LAPD did not immediately respond because graffiti was not an urgent public safety issue; the restaurant had never been robbed and suffered no damage during the "civil disturbance in the 1990s"; Figueroa Street was an area that prostitutes frequented; Tam's did not sell condoms, illegal drugs, or alcoholic beverages, and did not promote drug sales on its premises; they could not afford a security guard; the majority of Tam's customers were area residents; and they provided the LAPD with a trespass arrest authorization—a form that authorized the LAPD to arrest persons unlawfully loitering on the property. Plaintiffs agreed to comply with several operating conditions recommended by the Los Angeles City Attorney, but plaintiffs would not agree to operating conditions that required them to not allow patrons to "linger over a soda or other soft drink for more than 30 minutes"; not allow prostitutes, pimps, drug users or dealers, or homeless individuals to loiter on the property for any purpose; not allow alcoholic beverages to be consumed on the property; paint over graffiti on the property with a matching color within 24 hours; have a California licensed, bonded, and uniformed security guard at the restaurant seven

---

[1] The transcript for the hearing—if any—is not a part of the record on appeal. The testimony set forth below is from testimony the Zoning Administrator summarized in its "determination" following the hearing.

days a week from dusk until the restaurant closed who would, among other things, enforce the suggested operating conditions; install and maintain adequate fencing closing off the space on the north side of the business; implement a 24-hour "hot line" telephone number for any inquiries or complaints about the restaurant or its operation; and limit the restaurant's hours of operation to 6:00 a.m. to midnight Sunday through Thursday and to 6:00 a.m. to 2:00 a.m. Friday and Saturday.

Officer Dickes testified that the LAPD had attempted to work with Tam's since 2010 to mitigate nuisance and criminal activity, but plaintiffs had not cooperated. Not all businesses in the area were maintained in a manner similar to Tam's. A different Tam's restaurant located at Manchester and Figueroa—about 20 blocks from plaintiffs' Tam's— had a "similar surrounding environment in terms of nuisance and criminal activities," but its physical condition was unlike plaintiffs' restaurant.

In rebuttal, plaintiffs testified that transients were everywhere and a business owner or operator could not control them. A security guard would cost between $5,000 and $8,000 per month, which compensation plaintiffs could not afford.

On October 1, 2012, the Zoning Administrator issued its determination that Tam's was a public nuisance that required the modification of its operation to mitigate adverse impacts on persons and properties in the surrounding area. The Zoning Administrator found, pursuant to section 12.27.1, subdivision (b), that Tam's was being operated in a manner that adversely impacted nearby residential or commercial uses; jeopardized or endangered the public health or safety of persons residing or working on the premises or in the surrounding area; constituted a public nuisance; resulted in repeated nuisance activities including but not limited to disturbances of the peace, illegal drug activity, harassment of passersby, prostitution, theft, assaults, batteries, loitering, and police detentions and arrests; and violated provisions of the Los Angeles Municipal Code, and other city, state, or federal regulations, ordinances, or statutes.

The Zoning Administrator imposed 22 operating conditions on Tam's that included keeping the property free from trash and debris; requiring graffiti eradication; limiting hours of operation; hiring a security guard to be present from dusk to the close of

5

business; installing a camera surveillance system that covered all common and high risk areas of the property; barring access to the property to prostitutes, pimps, prostitution customers, parolees with prior narcotics or prostitution offenses, narcotics users, narcotics possessors, narcotics sellers, and manufacturers of illegal controlled substances; establishing a 24-hour inquiry and complaint "hot line"; and installing a six-foot wrought iron fence. Plaintiffs filed an appeal from the Zoning Administrator's determination to the Los Angeles City Council.

## II.    Plaintiffs' Administrative Appeal

At the November 20, 2012, appeal hearing before the Los Angeles City Council's Planning and Land Use Management (PLUM) Committee, Associate Zoning Administrator Susan Chang testified that plaintiffs had not maintained Tam's. She noted that the menu boards were illegible because they were covered by graffiti. Between May 1, 2009, and February 13, 2012, the LAPD made 58 service calls to Tam's. Less than a week before the hearing, the LAPD arrested "individuals" at Tam's for narcotics offenses. Ms. Chang compared plaintiffs' Tam's to the Tam's restaurant located at Manchester and Figueroa, which she said was 10 to 15 blocks from plaintiffs' restaurant. According to Ms. Chang, the Manchester and Figueroa Tam's was in an area of similar "crime data," but was "sparkling clean" and its operation did not create any "problems." The Manchester and Figueroa Tam's dining hours ended at 10:00 p.m., but its drive-through window remained open until 11:00 p.m. Ms. Chang recommended that the committee revise the operating hours condition she imposed on plaintiffs' Tam's to require it to close at 10:00 p.m. or 11:00 p.m.

LAPD Detective Eric Moore testified that he oversaw all nuisance abatements in the City and that Tam's was a top priority because of the crime associated with the location and the community "outcry." Asked whether Tam's was in an area where there already was crime and it was "caught in the crossfire" or whether Tam's was a stimulus or "spark plug" that created the tension that resulted in crime, Detective Moore responded that he believed the evidence would show "a clear nexus with Tam's location as being an

6

anchor . . . and center of some of the criminal activity . . . ." He further testified that there were a number of restaurants "up and down the Figueroa corridor" that were not the subject of nuisance investigations. Detective Moore stated, "I think that is a poor argument for them to simply say that it's this area whereas there are other businesses in the area that are thriving that do not have the crime nexus that this location has."

Officer Dickes testified that the LAPD attempted to work with property owners to remedy nuisances with suggested operating conditions before it resorted to abatement proceedings. He testified that in November 2011, he sent plaintiff Jack Benetatos a letter informing him that Tam's was the subject of a nuisance investigation. He included a list of suggested operating conditions to address the nuisance activities at Tam's. Jack Benetatos called Officer Dickes and left a message that said, "I'm the business owner, which is responsible for the inside, not the outside. There are a lot of problems outside with transients and drug dealers. That's a police problem, not mine." According to Officer Dickes, the "business owner"—presumably Jack Benetatos—left in the middle of the June 21, 2012, section 12.27.1 hearing after Ms. Chang informed the owner that she was going to impose operating conditions on Tam's. Officer Dickes found such conduct "disrespectful to the process and disrespectful to Ms. Chang, and unfortunately this is the kind of business owner that we're dealing with today."

Referring to Ms. Chang's testimony about 58 LAPD service calls to Tam's, Officer Dickes testified that there had been 150 to 200 service calls in and around the area of Tam's. Officer Dickes acknowledged that Tam's was not responsible for all of those calls, but noted that Tam's and a nearby gas station were the only businesses in the primarily residential area. Detective Moore testified that of the 58 LAPD service calls to Tam's, 31 took placed between 8:00 p.m. and 5:00 a.m. Detective Patrick Shields testified that the service calls to Tam's included loitering, narcotics, prostitution, gang activity, assaults, and shootings.

Detective Moore read excerpts from a citizen's declaration concerning criminal activity the citizen had seen at Tam's. Eight residents of, or business owners from, the area around Tam's testified about criminal activity they had observed at Tam's. One

7

citizen testified, "I've actually been over there over 25 years and never patronized that establishment . . . there's always people hanging out there. It's kinda dangerous and scary looking even to go by. . . . [E]ven when you at the gas station, you're trying to hurry up and get your gas cuz you never know when something's gonna break out over there. I mean, there's always shooting over there. There's always fighting over there. Every now and then—I'm a—I'm a married man, but every now and then I can get a glance of prostitutes over there with little or nothing on . . . . I mean, we have our babies over there in that community, and we need to look out for our babies that's our future, and something need to be done. I mean, it's no way that should be going on."

Plaintiffs' attorney stated that plaintiffs had implemented some of the LAPD's suggested operating conditions by removing seating, a pay telephone, and a breezeway and by turning over video to the police and signing a trespass arrest authorization form upon which authorization, the attorney claimed, the LAPD had not acted. He said that plaintiffs did not object to reasonable measures, but that the City had not done what it could do to alleviate the problems. He disputed that the crime statistics were the same for the areas around the Manchester and Figueroa Tam's and plaintiffs' Tam's and stated that there was a hotel across the street from plaintiffs' Tam's that attracted prostitution activity. According to plaintiffs' attorney, plaintiffs objected only to three operating conditions: the reduction in hours of operation, the requirement that they hire a security guard, and the requirement that they install a new video surveillance system.

Plaintiff Nick Benetatos testified that the community loved Tam's—it had never been robbed and was the only business in the area that survived the "riots." Tam's did not sell drugs, paraphernalia, cigarettes, condoms, alcohol, or anything else that would attract criminal behavior. At the LAPD's request, he removed a pay telephone from which he had received $2,400 a year. The pay telephone's removal did not reduce loitering. He also removed tables at the LAPD's request and his business dropped by 15 percent. As for the difference in the appearances of the Manchester and Figueroa Tam's and plaintiffs' Tam's, Nick Benetatos said that the Tam's at Manchester and Figueroa was a newer building. He also said he could not spend money on plaintiffs' Tam's

8

because it had been in several foreclosures during the prior six years during which time he was constantly told that "this is your last week."

After the evidence was presented, Los Angeles City Councilmember Mitchell Englander said, "[T]he fact that this burger restaurant has had two people killed there, all of the issues of drinking in public and assault with a deadly weapon, and the property reports, and the cocaine for sale . . . . It just—I'm shocked, quite frankly, that the owner and/or operator has been so unresponsive . . . ." Councilmember Englander suggested changes to the Zoning Administrator's recommended operating conditions. He suggested that Tam's operating hours be limited to 8:00 a.m. to 10:00 p.m. Sunday through Thursday, and 8:00 a.m. to 11:00 p.m. Friday and Saturday. He also suggested that a security guard work from 5:00 p.m. until the restaurant closed rather than from dusk to closing time. He concluded, "To have those folks come here and question the fact the [LAPD] hasn't done enough when they've been out there nearly 60 times just at that local location is beyond reasonable, and so those would be my suggestions."

The PLUM Committee voted to recommend that the Los Angeles City Council deny plaintiffs' appeal and uphold the Zoning Administrator's findings with Councilmember Englander's suggested operating hours and security guard modifications to the Zoning Administrator's operating conditions. On December 5, 2012, the Los Angeles City Council denied plaintiffs' appeal and adopted the Zoning Administrator's findings as amended.

III.    **Plaintiffs' Petition for Writ of Mandate**

On January 11, 2013, plaintiffs filed a verified petition for writ of mandate seeking a writ that, as relevant here, commanded the City to set aside its nuisance determination concerning the operation of Tam's and the operating conditions based on that determination. In their petition, plaintiffs alleged that Tam's was in a high crime area in which homicides, drug crimes, and prostitution were common. They alleged that despite the "challenging nature of the surrounding community," they had operated Tam's successfully for many years.

9

Plaintiffs further alleged that in 2010, they acceded to the LAPD demanded changes to Tam's—the removal of two pay telephones and outdoor seating—out of an apparent "desire to show the community it was attempting to address the area's crime" even though there had been no allegation that plaintiffs had engaged in, aided, abetted, or otherwise encouraged criminal activity on or around Tam's. Plaintiffs compliance with the demands caused them to suffer a 15 percent drop in revenue, but crime in the area did not drop. According to plaintiffs, "rather than accept that the area's crime problem was caused by a host of factors beyond the control or responsibility of a restaurant that sold hamburgers and French fries, the LAPD and the City Planning Department embarked on an administrative process to tar and feather the Restaurant, eventually resulting in the declaration that the Restaurant was a public nuisance and the imposition of 22 conditions of operation that, if implemented, would force Plaintiffs out of business." Plaintiffs alleged the City thus improperly had imposed on them a general responsibility for public safety and abdicated its responsibility to police the community effectively.

Plaintiffs alleged that they were being blamed improperly for criminal activities in the area that were not in any way related to the purchase or consumption of food. They contended that the City failed to show how the lawful operation of a restaurant could cause nuisance activities. Plaintiffs argued that "[a] public nuisance cannot exist where there is no causal nexus or connection between an individual or entity's actions or inaction and an alleged nuisance. . . . The City has offered no evidence connecting the selling of food at a fast food restaurant with criminal activity in the surrounding community." Plaintiffs contended that they could not properly be held responsible for the criminal activity of third parties. The operating conditions imposed were so onerous and expensive, plaintiffs claimed, that they would force plaintiffs out of business.

On October 4, 2013, the trial court denied the writ petition, applying a substantial evidence standard of review and concluding there was substantial evidence supporting the City's determination that plaintiffs' operation of Tam's constituted a public nuisance. It found that "the [Plaintiffs'] operation of their Tam's franchise and the real property upon which it is located has resulted in the establishment of a gathering place at all hours

10

of the night which is obviously not maintained by its owner and where the owner apparently does not discourage loitering. . . . Indeed, [Plaintiff] Jack Benetatos' statements to Detective Dickes establish that this is precisely the business model the [Plaintiffs] apparently pursued. . . . There is also substantial evidence that the [Plaintiffs'] ill-maintained location is a hub of criminal activities and disturbances out of proportion with similar businesses which are located nearby but are maintained in a more appropriate manner . . . . Taken together, this is substantial evidence from which one may reasonably infer that Detective Moore's characterization of the [Plaintiffs'] business operations as an 'anchor' for criminal activity is accurate—in other words, that the poorly- and neglectfully-maintained restaurant premises cause the disproportionate level of criminal activity and disturbances, supporting the [Defendant's] determination that the operation of the business constitutes a public nuisance which is appropriately mitigated by mandatory conditions."

The trial court rejected plaintiffs' argument that the City was making them responsible for the criminal activities of third parties. Such an argument, the trial court found, was a mischaracterization of the City's effort to abate the nuisance by imposing operating conditions that would make criminal activity less attractive. It ruled that administrative abatement of a public nuisance was a separate and complementary exercise of the City's police powers when criminal prosecution of the offenders was insufficient by itself to secure the public peace. Thus, according to the trial court, it properly could determine that plaintiffs' failure reasonably to maintain their property in a manner that promoted public safety and passively discouraged criminal activity constituted a public nuisance that was subject to abatement. On October 22, 2013, the trial court entered judgment in the City's favor.

**DISCUSSION**

Plaintiffs contend that the trial court erred in denying their petition for writ of mandate. They contend that the trial court should have reviewed the matter de novo, using its independent judgment. They also argue that the City did not demonstrate that

11

they operated Tam's in a manner that constituted a nuisance because the City failed to establish a causal connection between their operation of Tam's and the nuisance activities of third parties, nuisance liability does not extend to consequences that are the proximate result of the intervening acts of third parties, and they owed no duty to the general public to prevent the criminal activity of third parties.

## I.  Standard of Review

Under Code of Civil Procedure section 1094.5, there are two alternative standards of review that a trial court uses to review a petition for writ of administrative mandamus. (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056-1057 (*JKH Enterprises, Inc.*).)  "If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence.  [Citations.]"  (*Id.* at p. 1057; see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8.)  "Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record.  [Citation.]"  (*JKH Enterprises, Inc., supra,* 142 Cal.App.4th at p. 1057.)

A right is fundamental "on either or both of two bases:  (1) the character and quality of its economic aspect; (2) the character and quality of its human aspect."  (*Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 780; see *Bixby v. Pierno* (1971) 4 Cal.3d 130, 144.)  The analysis is done on a case-by-case basis.  (*Bixby v. Pierno*, *supra*, 4 Cal.3d at p. 144.)  As stated in *JKH Enterprises, Inc., supra,* 142 Cal.App.4th at p. 1059, "'In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation.'  (*Bixby, supra,* 4 Cal.3d at p. 144 [93 Cal.Rptr. 234, 481 P.2d 242]."  (See *The Termo Co. v. Luther* (2008) 169

12

Cal.App.4th 394, 407 ["Given the facts before us [in *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1562], we concluded that the tavern owner had a fundamental vested right to continue the operation of the business"].) "The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power." (*Interstate Brands v. Unemployment Ins. Appeals Bd., supra,* 26 Cal.3d at p. 779, fn. 5.)

"The substantial evidence test has been applied to review administrative decisions that restrict a property owner's return on his property, or which increase the cost of doing business, or reduce profits, because such decisions impact mere economic interests rather than fundamental vested rights. [Citation.] [¶] In contrast, the independent judgment test is applied to review administrative decisions that will drive an owner out of business or significantly injure the business's ability to function. [Citation.]" (*Amerco Real Estate Co. v. City of West Sacramento* (2014) 224 Cal.App.4th 778, 784 (*Amerco*); see also *E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325.) As one authority has said, "When a case involves purely economic interests (*e.g.*, administrative decisions that result in restrictions on a property owner's return on property, increases in the cost of doing business, or reductions in profits), courts are far less likely to find a fundamental vested right." (California Administrative Mandamus (Cont.Ed.Bar 2014) Court's Scope of Review Under CCP § 1094.5, § 6.133, p. 6-99; see also *JKH Enterprises, Inc., supra*, 142 Cal.App.4th at p. 1060.)

Regardless of the standard of review that applied in the trial court, appellate courts apply a substantial evidence standard. (*JKH Enterprises, supra,* 142 Cal.App.4th at p. 1058.) If the trial court exercised independent judgment because a fundamental vested right was involved, we review whether substantial evidence supports the trial court's judgment. (*Ibid.*) If the superior court reviewed the administrative decision for substantial evidence because no fundamental vested right was involved, then our review is the same as the trial court's—we review the administrative record to determine whether substantial evidence supports the agency's findings. (*Ibid.*) In that review, we

13

resolve all conflicts in the evidence and draw all inferences in support of the agency's findings. (*Ibid.*)

Plaintiffs contend that the operating conditions that the City imposed were so costly that they would be forced to close Tam's. Thus, they argue, their fundamental vested property rights were implicated, and the trial court should have employed its, and we should employ our independent judgment in reviewing the City's nuisance finding. The trial court rejected plaintiffs' argument that it should review the City's nuisance finding under the independent judgment standard. It found that plaintiffs' claim that the operating conditions the City imposed were too costly and would force Tam's out of business was based solely on their own unsupported conclusions. It found that while the required expenditures would impact Tam's profitability, a restriction on plaintiffs' return on their use of their property impacted economic interests and not fundamental vested rights.

The trial court properly found that plaintiffs failed to demonstrate that the cost of the operating conditions that the City imposed would force Tam's out of business. Although there was some discussion in the record about the cost of the security guard, plaintiffs presented no evidence concerning Tam's profitability and projected losses in the event it had to take the steps required by the City. Because plaintiffs suggested only an economic effect from the required operating conditions, rather than showing that the operating conditions would severely impair their ability to function or would drive them out of business, the trial court properly used the substantial evidence standard of review. (*Amerco, supra,* 224 Cal.App.4th at p. 784; *JKH Enterprises, supra,* 142 Cal.App.4th at p. 1057.) Accordingly, we review the administrative record to determine whether substantial evidence supports the City's findings. (*JKH Enterprises, supra,* 142 Cal.App.4th at p. 1058.)

Plaintiffs also claim that the independent judgment test is appropriate because even if the economics of the operating conditions that the City imposed would not force plaintiffs to close Tam's, the Los Angeles Municipal Code empowers the City to order a business closed for failing to comply with operating conditions. Because this case does

14

not concern an order by the City to close Tam's based on plaintiffs' refusal to comply with the operating conditions the City imposed, we will not use a standard based on such a circumstance.

## II.    Application of Relevant Principles

Civil Code section 3479 defines a "nuisance," in part, as "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ."  "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."  (Civ. Code, § 3480.)  A property owner who fails to take reasonable actions to prevent criminal activity on the owner's property may be subject to nuisance liability if that criminal activity harms the surrounding community. (*Lew v. Superior Court* (1993) 20 Cal.App.4th 866, 870-875 [plaintiffs were liable for nuisance under Health and Safety Code section 11580 because their apartment building was operated as a center for the sale and distribution of drugs and plaintiffs "did not take all reasonable measures available to them to control their property"]; see Rest.2d Torts § 838 ["A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and (a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and (b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance"].)

Section 12.27.1 governs administrative nuisance abatement proceedings in the City.  Subdivision (b) of that section states, in relevant part:

"Notwithstanding any other provision of this Code to the contrary, the Director may require the modification, discontinuance or revocation of any land use or discretionary zoning approval if it is found that the land use or discretionary zoning approval as operated or maintained:

15

"1.     Jeopardizes or adversely affects the public health, peace, or safety of persons residing or working on the premises or in the surrounding area; or

"2.     Constitutes a public nuisance; or

"3.     Has resulted in repeated nuisance activities, including, but not limited to disturbances of the peace, illegal drug activity, public drunkenness, drinking in public, harassment of passersby, gambling, prostitution, sale of stolen goods, public urination, theft, assaults, batteries, acts of vandalism, loitering, excessive littering, illegal parking, excessive loud noises (especially in the late night or early morning hours), traffic violations, curfew violations, lewd conduct, or police detentions and arrests; or

"4.     Adversely impacts nearby uses; or

"5.     Violates any provision of this chapter; or any other city, state, or federal regulation, ordinance, or statute . . . ."

There is substantial evidence in the record to support the City's determination that plaintiffs operated Tam's in a manner that constituted a nuisance in violation of section 12.27.1.  The evidence shows that plaintiffs failed to maintain the restaurant or the property the restaurant occupied.  There was trash and debris throughout the property and graffiti covered the building, walls, and menu signs—the graffiti on the menus signs was so extensive that the signs were illegible.  The manager permitted the graffiti to remain on the property, believing it was futile to attempt to remove it.  There also was loitering and gang activity, and persons were drinking alcohol at the restaurant.  From May 1, 2009, to February 13, 2012, the LAPD received 58 calls for service at Tam's.  The crimes committed at Tam's included misdemeanor battery, public drinking, drug offenses, prostitution, pimping, two homicides, and two assaults with deadly weapons.  Plaintiffs kept the restaurant open 24 hours a day, and over half of the LAPD's service calls to Tam's took place between 8:00 p.m. and 5:00 a.m.  Residents and business owners from the surrounding community were exposed to and complained about the criminal activity that took place at Tam's.

That plaintiffs' operation of Tam's caused the nuisance activities is demonstrated by a comparison of their restaurant to the Manchester and Figueroa Tam's.  Plaintiffs'

16

Tam's and the Tam's at Manchester and Figueroa were separated by no more than 20 blocks and were located in areas with similar crime statistics. Plaintiffs failed to maintain their restaurant and the property on which it was located, kept their restaurant open 24 hours a day, and their restaurant and the property on which it was located were a hub of criminal activity. The operators of the Manchester and Figueroa Tam's kept their restaurant "sparkling clean," closed their restaurant at 10:00 p.m., and there were no "problems" associated with their restaurant. Detective Moore also testified that there were a number of restaurants "up and down the Figueroa corridor" that were not the subject of nuisance investigations. These comparisons justify the conclusion that Tam's was operated in a way that caused a nuisance. Accordingly, there is substantial evidence in the record to support the City's determination that plaintiffs' operation of Tam's resulted in a nuisance in violation of section 12.27.1.

Relying on *Martinez v. Pacific Bell* (1990) 225 Cal.App.3d 1557, plaintiffs argue that the City's nuisance finding improperly held them responsible for the intervening criminal acts of third parties. The trial court properly rejected this argument, concluding that the City brought its nuisance abatement proceeding not to hold plaintiffs responsible for the criminal acts of third parties, but to make criminal activity at Tam's less likely through the imposition of operating conditions.

Plaintiffs assert that they should not be responsible legally for the problems that occur in a high crime area. But there was substantial evidence that plaintiffs failed to take steps to ameliorate the situation. As stated in *O'Hagen v. Board of Zoning Adjustment* (1971) 19 Cal.App.3d 151, 163 footnote 7, "It is recognized that a business which, when established was entirely unobjectionable, may, under changed circumstances, become a nuisance. [Citations.] Accordingly, a business which is not per se a nuisance may become one by the manner in which it is conducted. [Citations.] Thus, it has been held that a drive-in restaurant, although not a nuisance per se because it is a lawful business, may become a nuisance because of the manner of its operation. [Citations.]" (See *Willson v. Edwards* (1927) 82 Cal.App. 564, [drive-in food stand was nuisance because of patron noise and food odor during late night and early morning

17

hours]; *Wade v. Fuller* (Utah 1961) 365 P.2d 802 [drive-in restaurant a nuisance because of activities of patrons]; *State v. Rapuano* (Fla.App. 1963) 153 So.2d 353 [drive-in restaurant, motel, and beer parlor a nuisance because of noise, fights, and immoral acts on premises].)  There is sufficient evidence in the administrative record that plaintiffs' operation of Tam's violated section 12.27.1, and the abatement proceeding and nuisance finding properly addressed the nuisance activities that plaintiffs' operation of Tam's caused.

## DISPOSITION

The judgment is affirmed.  The City is awarded its costs on appeal.

**CERTIFIED FOR PUBLICATION**


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


GOODMAN, J.*

---

\* Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.