Filed 1/18/24  P. v. Group IX BP Properties CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GROUP IX BP PROPERTIES, LP, et al., <br><br> Defendants and Appellants. | B322878 <br><br> (Los Angeles County Super. Ct. No. 22STCV05624) |

APPEAL from an order of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Affirmed and remanded with directions.

Hydee Feldstein Soto, City Attorney, Kathleen A. Kenealy, Chief, Public Rights Branch, Shaun Dabby Jacobs, Supervising Deputy City Attorney, Rahi Azizi and Jonathan H. Eisenman, Deputy City Attorneys for Plaintiff and Respondent.

Larson, Stephen G. Larson, Jerry A. Behnke, Daniel R. Lahana, and Ranja F. Rasul for Defendants and Appellants.

# INTRODUCTION

In this nuisance abatement action, the People of the State of California, acting by and through the City of Los Angeles (the People), allege a gang-related public nuisance exists at a 116-unit apartment complex in North Hollywood, commonly known as the Vanowen Apartments. Defendants and appellants Group IX BP Properties, LP, Group IX BP Properties, Inc., Regency Management, Inc., PAMA Management, Inc., and Golden Management Services Inc. (collectively, defendants) own and manage the property.[1]

The People sought a preliminary injunction pending trial, requesting the court mandate defendants immediately implement several safety measures including, among others: ensuring the property's access gates can only be opened electronically with a system that tracks and records each time a tenant comes and goes from the property; replacing the property's camera surveillance system; removing graffiti within 48 hours of its appearance; and hiring four armed private security guards to patrol the property 24 hours a day, seven days a week. The trial court granted the motion in part, and defendants appealed.

On appeal, defendants contend the trial court abused its discretion by: (1) failing to address the element of duty—an essential element for a public nuisance cause of action based on a failure to act; (2) misapplying the causation element of a cause of action for public nuisance; and (3) failing to acknowledge the

---

1    The People also sued two individuals, Swaranjit S. Nijjar and Daljit K. Kler, who allegedly own and operate the property through the corporate entities. The trial court denied the People's request for a preliminary injunction against the individuals. They are, therefore, not parties to this appeal.

irreparable harm defendants would suffer from a preliminary injunction. For the reasons discussed below, we reject these contentions and affirm.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

The property is a large apartment complex located at 13100-13211 Vanowen Street in North Hollywood, consisting of 12 two-story buildings surrounding several common courtyards. It has a rear parking lot that runs along the entire south side of the complex and abuts a public alley (the alley). Numerous families, including more than 100 children, live at the complex.

Gang-related crime has been an issue in North Hollywood for decades – going back even to the late 80's. The property is located within the territory that two rival gangs, the North Hollywood Locos (Locos) and MS-13, fight over. This "turf-war" has resulted in shootings, assaults with deadly weapons, and vandalism at the property.

In an attempt to reduce the gang-related activity at and around the property, representatives of the Los Angeles Police Department (LAPD) and the City Attorney's Office met with defendants or their representatives on four occasions in 2009, 2010, 2018, and 2019.[3] Law enforcement provided defendants

---

2      After the close of briefing in this appeal, defendants sought to raise an additional issue: whether the preliminary injunction must be modified in light of Government Code section 53165.1, which first became effective January 1, 2024. We decline to resolve this issue, which was never presented to the trial court.

3      In 2017, the People filed a nuisance abatement action against Nijjar and other entities based on their alleged mismanagement and neglect of another large apartment complex

with a list of suggested improvements to the property to deter crime, including installing fencing around the perimeter of the property, hiring a security guard (24 hours a day/7 days a week), installing and maintaining high intensity lighting in the common areas, and installing additional gates with locks. Defendants implemented only a fraction of the suggestions. Following another outbreak of violence at the property in 2021, LAPD determined that another meeting would be pointless.

In February 2022, the People filed a complaint alleging defendants have owned, operated, and managed the property in a manner that creates a public nuisance (Civ. Code, § 3479 et seq.) and violates the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL). The complaint alleges the "public nuisance consists of, but is not limited to, the regular, menacing, intimidating, violent, and disorderly presence of resident and non-resident gang members and/or associates at the [p]roperty; the occurrence of gunfire on the [p]roperty, including gunfire that has resulted in injury and death to persons and damage to property on and around the [p]roperty; the occurrence of robberies and other crimes that take place on or emanate from the [p]roperty; the occurrence of gang members and/or associates setting off fireworks, playing loud music, double parking, and blocking driveways at the [p]roperty; and the tendency of the [p]roperty to attract gunfire from rival gangs because of the

---

known as the Chesapeake Apartments. (See *People ex rel. v. Pama V Properties, LP, et al.* (Super. Ct., Central District, L.A. County, No. BC683661.) The trial court in that case issued a preliminary injunction against Nijjar and associated entities in March 2018, around the same time as one of the meetings between LAPD and defendants regarding the Vanowen Apartments.

4

historical and current presence of gang members at the [p]roperty." As remedies for defendants' alleged mismanagement of the property, the People sought abatement of the alleged public nuisance, a permanent injunction, and civil penalties.

In April 2022, the People moved for a preliminary injunction supported by declarations of several LAPD officers, a property management expert, and two community members, along with over 100 police reports of incidents on the property or in the area.[4]

For example, the People submitted the declaration of Baudelia Salas, an officer assigned to the North Hollywood Division's Gang Enforcement Detail. He opined that the Vanowen Apartments are "the worst property in all of North Hollywood Division when it comes to shootings and gang-related crime." He explained: "The main attraction for Locos gang members is the [p]roperty itself: a private property with owners who have allowed the Locos to use the [p]roperty as they please. They have ample parking, multiple escape routes through unlocked pedestrian gates, friendly apartment units to hide themselves and their contraband, and plenty of surfaces to cover with gang graffiti that is slow to be removed, except when crossed out by rival gang members. They can also do all this in relative privacy, because the [p]roperty has poor lighting and very few surveillance cameras that they easily disable. Although the activities of the Locos extend off the [p]roperty and into the alley, sidewalks, streets, intersections and, neighboring properties, the

---

4    The People filed two virtually identical motions: one against the defendants named in the original complaint, and a second motion after the People amended their complaint to insert the true name of Doe 1.

source of nearly all of it is the Vanowen Apartments themselves. The gang members wouldn't be gathering in such large numbers in this area to begin with if they weren't using the Vanowen Apartments as their home base."

Timothy Kirkpatrick, a gang detective in the North Hollywood Division, opined that based on his 26 years of experience in the LAPD (including 20 years in the North Hollywood Division), most gangs seek out certain properties and locations to use as "'strongholds' to perpetuate the gang's unlawful activities." He explained that "[o]ften times, gang strongholds are unsecured apartment buildings with easy access and inadequate management or security. These tend to be locations that are neglected by ownership and management for years – where there are no locks or gates, where there is poor lighting, and where graffiti is not promptly removed – allowing the gang to [take over] and entrench themselves at the property." According to Kilpatrick, the property is "the single most dangerous location in North Hollywood because of the rampant gang activity that ownership and management have allowed to occur there through years of neglect and mismanagement."

Similarly, Carol Sawamura, a senior lead officer in the North Hollywood Division since April 2007, opined the Vanowen Apartments have been "a known North Hollywood Locos gang-controlled location for many years," and remain "the worst gang-controlled property" in her basic care area. According to Sawamura, because "[t]here is no other property in the entire division generating anywhere near the same consistently high level of gang-related shootings and other violent crimes[,]" "LAPD has been devoting enormous resources to crime suppression efforts at the [p]roperty." Thus, "the nuisance criminal activity at

the [p]roperty has required LAPD to divert resources to the [p]roperty, disproportionately, and away from other areas where they are needed."

With respect to private security at the property, Sawamura explained defendants "occasionally" provide private security through a company run by Mark Underwood. But Underwood also provides security for defendants at different properties and does not often visit the Vanowen Apartments. Several years ago, defendants hired onsite security following an outbreak of violence, but the guards only remained at the property for approximately two weeks. Underwood relayed to Sawamura that defendants could not continue stationing the guards there because they were assigned to other properties and it was not cost effective for them to remain at the Vanowen Apartments. Underwood has expressed concerns that conditions at the "[p]roperty [are] so bad that someone innocent would be killed any day now." In Sawamura's opinion, the "level of security that the [p]roperty owners have employed to date is woefully inadequate to protect public safety at the [p]roperty."

Regarding physical issues at the property, Sawamura opined that the "open and unlocked pedestrian gates provide free access to the [p]roperty to gang members; the outdated and frequently vandalized security camera system does not meaningfully prevent or deter crime at the [p]roperty; [and] the [p]roperty's lighting is inadequate[.]" It is Sawamura's impression that defendants have completely neglected the property by simply leaving it in the "hands of an overwhelmed resident manager who is isolated and completely unequipped to resist the gang's control of the [p]roperty."

In opposition to the People's motion, defendants principally argued the "freely-accessible public alley behind the [p]roperty" owned by the city – as opposed to the property itself – is "the real problem" and source of the nuisance. Thus, according to defendants, the People are unlikely to prevail at trial because they cannot prove defendants created or assisted in the creation of the purported nuisance, as required to prevail on a nuisance claim. They also argued the LAPD crime statistics establish violent crimes occur throughout North Hollywood and do not occur more frequently at the property or the surrounding areas. Defendants further noted they have made several property improvements, including a new surveillance system, perimeter lighting, and electronic key locks for the entry gates that may be opened with a key fob issued only to tenants.

Defendants submitted several declarations in support of their opposition. For example, Douglas Kane, a security consultant, opined "one of the most profound impacts in lowering crime in the area would be for the City to allow the property owners to assume control of the alley" so that defendants could "install electronic gates at both the west and east side of the alley, limiting access to residents only[.]" Noemi Oregon, the property manager, similarly declared that "[i]n [her] personal experience, it is the [a]lley, and not the [p]roperty, that is the center of gang activity in the area. Because the [a]lley is City property, Management lacks the authority to patrol or tow cars parked in the [a]lley. Gun violence in the area generally originates off of the [p]roperty, often the [a]lley."

Defendants also submitted declarations from 90 "Doe" tenants at the property. Many of the declarations blame the alley for the gang violence, not the property. For example, one tenant

8

states "[t]he gang members come from outside this property and gather in the alley." Another tenant states "I feel safe in this property but not so much in the alley."

After a hearing on the motion on July 7, 2022, the trial court granted the People's motion in part. It acknowledged the existence of a "factual dispute over whether the gang presence on the [p]roperty is caused by the conditions of the [p]roperty itself or the availability of the abutting alley[,]" but found the People "presented sufficient evidence concerning the conditions of the Property as a substantial factor causing and facilitating the ongoing presence of [Locos] members and the creation of the nuisance and has established a reasonable probability of prevailing on the [public nuisance] claim." The court further found defendants have "not established that issuing the preliminary injunction will cause irreparable harm" and "that the nuisance caused by gang presence at the [p]roperty is sufficiently severe to warrant immediate mitigating efforts." Based on these findings, the court ordered defendants to implement several security measures, including but not limited to, the following: "[t]he [p]roperty must be properly closed off to the public"; gates must operate through "some type of electronically controllable and trackable system such as a keypad that can store information about the person accessing the [p]roperty"; there must be "proper lighting of all public areas, including the parking lot, courtyards, and laundry room"; the property must have a "proper, operating web-based video camera monitoring system with a high-resolution, internet-connected, remotely viewable video monitoring system that allows management to monitor the [p]roperty and remove trespassing gang members"; defendants "must assign parking spaces to tenants and issue serialized

9

hangtags"; defendants must employ private security with an active license and "[a]t least four trained security officers must be present at the [p]roperty seven days a week during the hours of darkness throughout the year"; and a resident property manager must be on duty and on the property during all regular business hours."[5] The trial court further ordered counsel to meet and confer to reach an acceptable form for the preliminary injunction based on the court's ruling.

Following the parties' submission of proposed orders, the court entered the preliminary injunction on August 12, 2022. Defendants timely appealed.

## DISCUSSION

### 1.    Standard of Review

"[W]hether a preliminary injunction should be granted involves two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief." (*White v. Davis* (2003) 30 Cal.4th 528, 554.)

"Although preliminary injunctions are generally designed to '"preserve the status quo pending a determination on the

---

[5]    Defendants note they implemented many of these security measures before the trial court ruled on the People's motion, including but not limited to installing an electronic key fob system, an upgraded video surveillance system, and enhanced exterior lighting. Defendants did not, however, hire additional security guards or an additional onsite manager based in part on their argument that they would suffer irreparable harm given the substantial cost of implementing those measures.

10

merits of the action'" [citation], they are not so limited." (*Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc.* (2016) 6 Cal.App.5th 1178, 1883-1184.) "A court also has the power to issue a preliminary injunction that ""mandates an affirmative act that changes the status quo"'" [citation], but should do so only in those ""extreme cases where the right thereto is clearly established"'" [citation]." (*Id.* at p. 1184.) "We ordinarily review a trial court's issuance of a preliminary injunction for an abuse of discretion [citation], but ""more closely"'" 'scrutinize' injunctions that ""change[ ] the status quo"'" [citation]." (*Ibid.*) Thus, "[a]lthough a preliminary mandatory injunction is subject to stricter review on appeal, [citation], '[t]he principles upon which mandatory and prohibitory injunctions are granted do not materially differ. The courts are perhaps more reluctant to interpose the mandatory writ, but in a proper case it is never denied' [citation]." (*Ryland Mews Homeowners Assn. v. Munoz* (2015) 234 Cal.App.4th 705, 712, fn. 4.)

"In assessing the trial court's factual findings underlying a preliminary injunction, we apply the substantial evidence standard and view the evidence in the light most favorable to the court's ruling." (*Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc.*, *supra*, 6 Cal.App.5th at p.1184.)

## 2.    Governing Statutory Authority

A nuisance is defined, in relevant part, as "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." (Civ. Code, § 3479.) "A public nuisance is one which affects at the same time an entire community or neighborhood, or any

11

considerable number of persons . . . ." (*Id.*, § 3480.) "Civil Code section 3491 provides that the 'remedies against a public nuisance' include '[a]batement.'" (*People v. Padilla-Martel* (2022) 78 Cal.App.5th 139, 151.) "'''"An abatement of a nuisance is accomplished in a court of equity by means of an injunction proper and suitable to the facts of each case."'''" (*Ibid.*)

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) The UCL provides that "[a]ny person who engages . . . in unfair competition may be enjoined in any court of competent jurisdiction." (*Id.*, § 17203.) Thus, an injunction is an appropriate remedy under both the public nuisance law and the UCL.

### 3. The Trial Court Did Not Abuse Its Discretion By Issuing a Preliminary Injunction

#### A. Likelihood of Prevailing on the Merits

"The elements 'of a cause of action for public nuisance include the existence of a duty and causation.'" (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542; see also *Citizens for Odor Nuisance Abatement v. City of San Diego* (2017) 8 Cal.App.5th 350, 359, fn. 9 (*Citizens*) [duty is an element of a public nuisance claim when the plaintiff's nuisance theory rests on the defendant's failure to act].) Defendants contend the trial court abused its discretion by issuing a preliminary injunction without finding the People would likely prove these two essential elements at trial. For the reasons discussed below, we are unpersuaded.

12

## 1. Duty

Defendants argue the trial court abused its discretion when it found the People had a reasonable probability of success on the merits "without even addressing the element of duty." Preliminarily, we note the trial court is not required to explain its reasoning when it issues a preliminary injunction. (See *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 858 ["The hearing on a preliminary injunction is not the equivalent of a trial, and the court is not obligated to set forth its reasoning. [Citation] The trial court's [ ] order is entitled to a presumption that it is correct, and any error must be affirmatively shown"].)

In any event, although the trial court did not analyze "duty" under a separate heading in its order (nor did defendants in their opposition papers below), it did recognize the element of causation may consist of "either an act or a failure to act under circumstances in which *the actor is under a duty to take positive action* to prevent or abate the interference." (Emphasis added.) The trial court further found: (1) defendants own and operate the property; (2) law enforcement officials notified defendants of the unchecked gang activity related to the property and had meetings with defendants regarding the issue in 2009, 2010, 2018, and 2019; and (3) law enforcement made abatement suggestions to defendants, which defendants failed to meaningfully implement. These findings are sufficient to demonstrate a likelihood of proving, at trial, that defendants have a duty to abate the alleged nuisance on their property. (See *Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1553 [a landlord has an "indisputable duty to take reasonable steps to maintain its premises in a reasonably safe condition"]; see also *Benetatos v.*

13

*City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1282 ["A property owner who fails to take reasonable actions to prevent criminal activity on the owner's property may be subject to nuisance liability if that criminal activity harms the surrounding community"].)

Defendants nevertheless argue they do not owe a duty to prevent crime off of the property, including in the alley. In making this argument, defendants attempt to distort – or perhaps, misapprehend – the People's allegations and the trial court's preliminary injunction. The People sought a preliminary injunction to abate an alleged nuisance on defendants' property (i.e., disorderly presence of resident and non-resident gang members at the property –in the courtyards and parking lot –due to defendants' alleged mismanagement of the property), which allegedly causes violence at and around the property. The trial court granted the motion and ordered defendants to implement safety measures with respect to *their* property based on its finding that the conditions of the *property itself* were a substantial factor causing the "ongoing presence of [gang] members and the creation of the nuisance . . . ." That finding distinguishes this case from the sole case defendants rely upon in arguing they have no duty to prevent crime in the area. (See *Medina v. Hillshore Partners* (1995) 40 Cal.App.4th 477, 480-481 (*Medina*).)

In *Medina,* the decedent's mother sued the owner of an apartment complex that was a known gang hangout after gang members encountered the decedent near the apartments, chased him, and fatally shot him on a dead-end street. (*Medina*, *supra*, 40 Cal.App.4th at pp. 479-480.) The appellate court affirmed the trial court's judgment in favor of defendant after it sustained

defendant's demurrer without leave to amend. (*Ibid*.) The *Medina* court concluded a landowner does not owe a duty "to protect members of the public from gang members who congregate around an apartment complex and assault individuals on adjacent public streets." (*Id*. at p. 481.) But the plaintiff in *Medina* did not seek to abate a nuisance on the defendant's property, but rather sought to recover damages from the apartment owner stemming from her son's murder that occurred exclusively on other property. (*Id*. at p. 482.) Thus, *Medina* stands for the proposition that "'premises liability is limited to the premises.'" (*Ibid*.) That holding has no application here, where the People seek to abate a gang nuisance they allege exists on defendants' property.

We acknowledge defendants claim the criminal activity cited by the People "overwhelmingly occurs off the [p]roperty." But again, this argument misses the point. Even assuming a large proportion of the criminal activity occurs off the property, defendants have a duty to maintain their property to prevent foreseeable crime that harms the surrounding community. (See *Benetatos v. City of Los Angeles*, *supra*, 235 Cal.App.4th at p. 1282; see also *Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1478 ["A landowner's duty of care to avoid exposing others to a risk of injury is not limited to injuries that occur on premises owned or controlled by the landowner. Rather, the duty of care encompasses a duty to avoid exposing persons to risks of injury that occur off site if the landowner's property is maintained in such a manner as to expose persons to an unreasonable risk of injury offsite"].)

Defendants alternatively contend that even if they had a duty to protect individuals from gang activity, the duty was met

15

by the numerous safety and security measures implemented at the property. It is undisputed, however, that defendants implemented additional security measures (including upgrading the exterior lighting and video surveillance system, and installing electronic locks accessible via a key fob on the pedestrian gates) *after* the People moved for injunctive relief. Post-filing remedial steps do not deprive courts of their injunctive powers. (See, e.g., *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 133 [a defendant "'that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction'"]; see also *People ex rel. Feuer v. Superior Court (Cahuenga's The Spot)* (2015) 234 Cal.App.4th 1360, 1385 ["While voluntary cessation of conduct may be a factor in a court's exercise of its equitable jurisdiction to issue an injunction, it is not determinative; the trial court must also decide if an injunction affecting future conduct should be a part of the relief it grants"].) Thus, even assuming defendants took *some* remedial action after the People filed their complaint (the People dispute the extent of the measures taken), the trial court did not abuse its discretion by ordering defendants to implement safety measures, some of which may have already been taken.

In sum, we conclude substantial evidence supports the trial court's implied finding that the People will likely establish the element of duty at trial. We therefore turn to the element of causation.

## 2. Causation

To establish causation, a plaintiff must show "a 'connecting element' or a 'causative link' between the defendant's conduct and the threatened harm." (*Citizens*, *supra*, 8 Cal.App.5th at p.

16

359.) "''Public nuisance liability 'does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is *whether the defendant created or assisted in the creation of the nuisance.*'''" (*Ibid.,* original italics, quoting *Melton v. Boustred, supra,* 183 Cal.App.4th at p. 542.) "A plaintiff must show the defendant's conduct was a 'substantial factor' in causing the alleged harm." (*Citizens, supra*, 8 Cal.App.5th at p. 359.)

Defendants contend the trial court abused its discretion by misapplying the law relating to the element of causation. They rely on *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826, 833 (*Low*) for the proposition that absent an affirmative act by defendants, some evidence of ownership or control is necessary to hold defendants liable for their alleged failure to act. But the *Low* court merely held "that when a private owner maintains the grassy parking strip between the sidewalk and street curb, he exercises control over it, . . . ; thus, that [ ] owner is liable when his failure to maintain it in reasonably safe condition causes injury to a pedestrian." (*Ibid.*) Consistent with *Low*, the trial court in this case did not order defendants to make improvements to the city-owned alley; rather, it ordered defendants to implement safety measures on the property they own and control based on its finding that the People presented sufficient evidence demonstrating the "conditions of the [p]roperty itself" are "a substantial factor causing and facilitating the ongoing presence of [gang] members and the creation of the nuisance . . . ."[6]

---

6    Defendants also rely on *Martinez v. Pacific Bell* (1990) 225 Cal.App.3d 1557, but it is inapposite. It rejects an attempt to hold the owner of a pay phone liable for criminal acts of third parties

17

Defendants seemingly ignore the trial court's causation finding and reiterate in their reply brief on appeal that they are *not* arguing insufficient evidence supports the trial court's causation finding. Rather, defendants' position is that the trial court erred "by entering a preliminary injunction against [defendants] without first finding that they were the cause of the nuisance at issue." In other words, according to defendants, the trial court held that "it did not need to resolve the question of causation and that regardless of whether the cause of the nuisance was the condition of the city-controlled [a]lley *or* the condition of [defendants'] [p]roperty, [defendants] could be held liable in either event." But as discussed in more detail below, viewing the trial court's ruling as a whole, we disagree with defendants' interpretation of the trial court's findings (or lack thereof, according to defendants).

The trial court's order states, in relevant part: "There is a factual dispute over whether the gang presence on the [p]roperty is caused by the conditions of the [p]roperty itself or the availability of the abutting alley; however, as noted above, liability under the [public nuisance law] does not depend upon whether the defendant owns or controls the property. [Citation.] The Court finds that Plaintiff has presented sufficient evidence concerning the conditions of the Property as a substantial factor causing and facilitating the ongoing presence of [gang] members and the creation of the nuisance and has established a reasonable probability of prevailing on the [public nuisance] claim." Defendants' position (i.e., that the trial court erroneously failed to

---

on adjacent public property. (*Id.* at p. 1559) In contrast, this action seeks to require the defendants to abate criminal activity on their own property.

18

resolve whether the property or the alley is the cause of the nuisance) is understandable if the first sentence of the above-quoted passage is read in isolation. But when read in conjunction with the second sentence, it becomes apparent that the trial court issued a preliminary injunction based on its finding that the People presented sufficient evidence demonstrating the property is a substantial factor causing the nuisance, despite acknowledging the existence of a factual dispute regarding causation, which will ultimately be resolved at trial.

Moreover, "[e]ven if the record demonstrates that the trial court misunderstood or misapplied the law, the ruling must be affirmed if it is supported by any legal theory." (*Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1201.) Thus, assuming *arguendo* that the trial court believed a preliminary injunction is appropriate even without a finding that the property (as opposed to the alley) is a substantial factor in causing the gang presence, we must affirm if the ruling is supported by any other theory. Here, the parties agree the dispositive question is whether defendants "created or assisted in the creation of the nuisance" (*Citizens, supra*, 8 Cal.App.5th at p. 359, italics omitted) and the trial court explicitly found the People demonstrated the conditions of the property are a substantial factor causing and facilitating the nuisance. Defendants do not argue that finding is unsupported by substantial evidence. We therefore conclude the trial court did not abuse its discretion in analyzing the causation element of the public nuisance claim.

### B.    Balance of Harms

Turning to the second factor in deciding whether to issue a preliminary injunction, defendants contend the trial court abused

its discretion in concluding the balance of harms favors the People.

As a threshold matter, we note the parties disagree on the standard that applies in analyzing this factor. The People argue a "more deferential standard applies[,]" citing the following rule: "[W]here a legislative body has specifically provided injunctive relief for a violation of a statute or ordinance, a showing by a governmental entity that it is likely to prevail on the merits should give rise to a [rebuttable] presumption" that the potential harm to the public outweighs the potential harm to the defendants. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 71 (*IT Corp*.).) Because public nuisance statutes and the UCL authorize injunctive relief, the People argue they are entitled to a presumption of public harm. Defendants counter a presumption does not apply here, where the People do not allege a violation of a specific city ordinance or regulation declaring particular defined acts to be a nuisance per se, but rather allege a public nuisance under the general nuisance statutes. We need not resolve the issue here, however. As discussed below, even assuming (without deciding) that a presumption of public harm does not apply, we conclude the trial court was well within its discretion in finding the balance of harms weighs in favor of the People.

"The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause." (*IT Corp., supra*, 35 Cal.3d at p. 73.) As discussed above, the People submitted several declarations from the LAPD, including one in which the officer opined the property is the single most dangerous location in North Hollywood, and another stating that

if defendants "took control of the Vanowen Apartments back from the . . . Locos by implementing desperately needed safety measures, gang crime would be reduced not only on the [p]roperty, but also in the entire surrounding neighborhood." In response, defendants contend they demonstrated irreparable harm based on the "uncontradicted evidence" that the cost of merely one aspect of the preliminary injunction – hiring four security guards to patrol the property from sunset to sunrise – would cost defendants between $1.5 million and $2.4 million annually. But the only evidence cited in support of this statement is a declaration by defendants' security consultant, in which he opines the cost of hiring four armed security guards to patrol the property daily for *24 hours a day* would range between $1.5 million and $2.4 million annually. And, even if the record contained an uninflated estimate of hiring four security guards from sunset to sunrise, defendants provide no evidence demonstrating they cannot bear the cost of hiring security until a hearing on the permanent injunction.[7]

Accordingly, on this record, we conclude the trial court did not abuse its discretion by concluding the balance of harms favors the People and "the nuisance caused by gang presence at the

---

7  The People's property management expert opined that the value of the property is approximately $30 million and, based on his review of one lease from 2018, the property generates approximately $2 million annually in rental income. He further declared that, based on media reports, the owners of the property own a portfolio of properties comprised of 16,000 units in California, worth approximately $1.3 billion.

[p]roperty is sufficiently severe to warrant immediate mitigating efforts."[8]

## DISPOSITION

The order is affirmed. On remand, the trial court is directed to consider, after briefing and argument, whether any of the terms of the preliminary injunction must be modified in light of Government Code section 53165.1, effective January 1, 2024. We express no view on that issue. The People are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

COLLINS, J.

ZUKIN, J.

---

8      Having concluded the trial court did not abuse its discretion in issuing a preliminary injunction based on the People's public nuisance claim (Civ. Code, § 3479 et seq.), we need not decide if the preliminary injunction is also proper under the UCL.