Filed 3/28/2024

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B309295 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BC718027 |
| v. | |
| FREETOWN HOLDINGS COMPANY et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Broadbelt, Judge. Affirmed.

Emmanuel Nwabuzor and Travis M. Poteat for Defendants and Appellants.

Hydee Feldstein Soto, City Attorney, Kent J. Bullard, Assistant City Attorney, and Zachary T. Fanselow, Deputy City Attorney, for Plaintiff and Respondent.

_____

The People of the State of California sued Holiday Liquor for enabling a public nuisance. They claimed the store amounted

to a snack bar where illegal drug buyers and sellers congregated and waited to connect:  Holiday tolerated loitering and drug dealing, had no guards, stayed open until 2 a.m., and sold alcohol in cheap single-serving containers.  The trial court granted summary judgment for the People and ordered Holiday to hire guards, to stop selling single-serving containers of alcohol, and to take other actions.  We affirm.

I

Abdul Jamal Sheriff owns Holiday Liquor.  Sheriff bought the store in 2005 or 2006 and later deeded it to Freetown Holdings Company, of which Sheriff is the sole officer and director.  We refer to the appellants as Sheriff, Holiday, or Holiday Liquor.

A

Holiday is in the West Adams area of Los Angeles.

The People filed a complaint against the store in August 2018 and an amended complaint in February 2019.  The amended complaint described ongoing drug dealing and gang-related violence within and in front of Holiday.

The operative complaint had three counts.  It asserted violations of (1) sections 11570 et seq. of the Health and Safety Code (the drug house law), (2) sections 3479 et seq. of the Civil Code (the public nuisance law), and (3) sections 17200 et seq. of the Business and Professions Code (the unfair competition law).

The People moved for summary judgment and summary adjudication on these three counts and included hundreds of pages of supporting documents detailing crime at and around the store.

B

The People's evidence was extensive.

2

Detective Jedd Levin testified he is an experienced narcotics investigator who had observed dozens of drug deals at Holiday, both inside and outside the store. They followed a standard pattern.

Levin "frequently observe[d] people drive up to the curb in front of Holiday Liquor to engage in narcotics transactions with people who loiter outside of the store looking for drugs."

What Levin observed was "consistent with illegal narcotics sales occurring in and around Holiday Liquor on a regular basis." He "regularly observed drug dealers, hooks, drug users, and transients loitering inside and around Holiday Liquor for the purpose of using, purchasing, and/or selling illegal narcotics." "Hooks" are "facilitators who connect people seeking to buy drugs with dealers, and who typically receive a small amount of cash or drugs for their services."

According to Levin, Holiday ran the store in a way that enabled this situation. The store's practices made the store "hospitable for drug dealers." Levin had "never once seen anyone loitering in or around the store be asked to leave. Drug dealers, drug users, and hooks are permitted to loiter and engage in illegal narcotics transactions without any interference from the ownership, management, or employees of Holiday Liquor."

The store had "developed a reputation in the community and amongst law enforcement as a location where illegal drugs are bought and sold" and "is essentially a place to wait for drugs that also has a snack bar where drug users and drug dealers can and do buy snacks, drinks, cigarettes, and alcohol."

According to Levin, drug dealers knew they could buy cheap alcoholic drinks and wait at the store for customers. Customers knew they could score there. The store had allowed itself to

become the neighborhood focal point for the drug trade, and those in the drug trade knew it. Based on his observations, Levin opined "Holiday Liquor is the primary cause of the illegal narcotics activity" in the area.

Others bolstered Levin's testimony.

Officer Filiberto Garcia is an experienced police officer assigned as a gang officer in Holiday's neighborhood. Garcia received frequent community complaints about nuisance activities at Holiday, and he often saw them himself. These activities included gang members and transients drinking in public. "Their drinks of choice are the inexpensive, single-serving containers of alcohol that Holiday Liquor offers for sale at all hours. There is near-constant loitering in the area of Holiday Liquor."

"I frequently observe pedestrian traffic and hand-to-hand transactions that are consistent with the illegal sales of narcotics in the area of Holiday Liquor."

Garcia also recounted the presence at Holiday of West Boulevard Crips. He said Holiday was the "most active and dangerous" West Boulevard stronghold in the territory. Members of this gang felt "comfortable at Holiday" to the extent that gang members filmed music videos there. Gang members staged videos featuring the Holiday store sign. Their videos show the interior and front of the store.

According to Garcia, permitting gang members to congregate regularly at a notorious spot invites trouble: they attracted the attention of rival gang members seeking to settle a score or to do work for rival gangs. The situation was a recipe for "murders or drive-by shootings."

Officer Brent Williams testified Holiday has a reputation among community members and law enforcement as a place where gang members sell drugs. Many times, Williams has seen gang members and transients loitering inside Holiday and near the store's front entrance.

Williams confirmed members of the West Boulevard Crips use Holiday as their home base. They "hang out in the area of the store all day long" drinking alcohol or smoking cigarettes from the store. They "congregate at Holiday Liquor because it is convenient for them: they live in the area, and the store attracts an endless supply of transients to whom they can sell illegal narcotics. Holiday Liquor sells inexpensive, single-serving containers of alcohol that are popular with West [Boulevard] gang members and transients alike. In my experience, Holiday Liquor's management and employees have permitted the near-constant loitering to occur without resistance."

Williams testified Holiday has been the subject of countless citizen complaints and calls to the police. He said that, "[o]n more than one occasion, community members have told me something along the lines of, 'You have to do something about that store!' (referring to Holiday Liquor)."

Williams noted that violent crime at Holiday "tends to occur later at night."

Williams also testified that officers throughout the Southwest Division know of Holiday as a gang and narcotics nuisance location. Police in this division have come to expect reports of violent gang crimes at Holiday. This reputation for criminal activity is attributable specifically to Holiday, and not to the neighborhood in general.

5

Senior Lead Officer Ana Maria Mejia was assigned to this neighborhood in 2014. She was to help unite the police with community members by monitoring crime trends and by understanding the community's desire for police service. Mejia did "a lot of proactive work with community members on chronic or quality-of-life crimes."

Mejia thought, as a gang expert with experience in Holiday's area, it was virtually impossible for police to arrest their way out of a serious gang problem unless local owners made improvements to their properties to help police.

Mejia had become familiar with Holiday in her years in the neighborhood. She knew the area around Holiday "very well." She saw gang activity and drinking in public at Holiday. The store was a constant problem.

Mejia testified police resources are limited and the disproportionate number of calls about Holiday diverted efforts needed in other areas. She explained police deterrence also is inevitably temporary: it falls off rapidly once police depart. Brazen criminals simply outwait the cops. "More effective and permanent deterrence of crime cannot be achieved without the more serious and committed involvement of the Holiday Liquor's ownership and management."

Mejia was in frequent contact with Sheriff about the drug dealing at Holiday. "Mr. Sheriff knows there is violent crime, gang activity, and narcotics activity associated with Holiday Liquor because I have told him as much in my multiple encounters with him."

Between 2015 and the filing of this suit in August 2018, Mejia repeatedly asked Sheriff to take three measures: (1) hire armed and licensed guards to deter loitering and to prevent

violence; (2) close at midnight or cease alcohol sales then; and (3) stop selling single-serving containers of alcohol.

Sheriff occasionally seemed receptive, "but there is rarely, if ever, any follow through on his part. The only action I am aware of that Mr. Sheriff has undertaken to prevent or deter crime is the installation of security cameras."

"Despite my repeated requests, prior to the filing of this nuisance abatement, Mr. Sheriff did not implement multiple requested remedial measures. In fact, it was like pulling teeth to simply get Mr. Sheriff to comply with an [Alcoholic Beverage Control] regulation by removing signage that was blocking the windows of his store. Further, although Mr. Sheriff has told me that he is making an effort to deter loitering, I continue to see West [Boulevard] gang members loitering outside the store when I drive past. Whatever effort he made, if any, is not apparent or visible and is clearly ineffective."

C

The People documented specific crimes at Holiday.

The narcotics sales included the following.

In August 2018, Levin and his team observed a man loitering in front of Holiday for about 30 minutes. The man moved back and forth between the entryway and the side of the store until he approached a Ford Explorer and spoke to the driver. After the Explorer drove away, the man on foot approached a woman and engaged in a furtive hand-to-hand narcotics transaction with her. Police observed the woman flag the Explorer, hand the driver something through the open window, leave with cash in her hand, and then give the cash to the man on foot. This man went back to loitering directly in front of the store. He was sweeping the store's entryway and had $20

7

cash in his front pocket when police arrested him. When police arrested the driver, they found rock cocaine inside the Explorer's center console.

In September 2018, officers observed a West Boulevard Crips member park his car in front of Holiday and wait. Another West Boulevard Crips member walked to the passenger side of the car. He made hand contact with the driver and then loitered in the store's entryway. The driver got out of the car and engaged in a hand-to-hand transaction with his fellow gang member in the entryway. Officers stopped the car and found dozens of baggies of what appeared to be rock cocaine and debris of ecstasy. They also found pills, bundles of money, and a loaded gun.

In a November 2018 undercover operation, Levin and his team used an informant to make a controlled buy of narcotics at Holiday. The informant approached a hook in front of the store, who went inside, contacted a woman loitering inside, returned, and gave the informant rock cocaine for $60.

The People also had proof of violent crimes in and around Holiday. This proof, including the police evidence just recounted, suggested this violent crime was closely linked to the drug trade. Commerce in illegal drugs is a cash business, which creates attractive targets for robberies and violence. Crime victims in this environment may be reluctant to complain to police. Guns and other means of violent self-help can abound.


There was evidence of 10 violent crimes at Holiday:
1. In February 2011, a victim was shot many times as he was about to enter Holiday.

8

2. In October 2014, two people were shot standing in Holiday's doorway.
3. In April 2015, a homicide in front of the church next to Holiday was connected to Holiday because the victims "had no other reason to be in the area except to hang out" at the liquor store. A second victim was shot but refused to cooperate with police, as did the other witnesses.
4. In May 2016, one group shot at another when they encountered each other inside Holiday.
5. In July 2017, a person walking into Holiday was shot.
6. In September 2017, an assailant punched and attempted to rob a victim outside of Holiday.
7. In March 2018, a robber hit a man leaving Holiday, knocked him unconscious, and took his cash, watch, and phone. The victim required hospitalization.
8. In April 2018, two gang members attacked two others inside Holiday.
9. In May 2018, a two-shooter gun battle erupted as people left Holiday. Four people suffered bullet wounds. One was a West Boulevard gang member named Henry Hall. This was the second time in less than a year Hall had been shot at Holiday. An officer watching a video of this shooting found it "particularly shocking. It looks like a movie scene."
10. In 2018, a black Charger pulled up in front of Holiday and shot at a group loitering outside the store. The members of the group dived to the ground or started running. No one reported the event to police, who learned about it from video footage.

Ten violent crimes in eight years at a specific locale is unusual. According to gang officer Garcia, "this is a remarkably high level of gun violence occurring at a single location."

D

Holiday opposed the People's summary judgment and summary adjudication motion. It argued many issues of material fact defeated the People's effort. Below, we zero in on Holiday's specific arguments in our legal analysis. For now, we merely sketch Holiday's position.

Sheriff argued he was a good community member and a leader who enjoyed local support and who was trying his best to combat community problems. "I have done a lot more than any other business establishment in the area to prevent any form of criminal conduct within and around the premises of the store." Sheriff maintained a high incidence of crime historically has plagued the West Adams neighborhood.

Sheriff did not cause problems like gang crime, drug dealing, and homelessness, he said; in fact, he sought help from the City Council to cope with "the inflow of homeless people, transients, and prostitutes on the West Adams corridor[.]" The City Council did nothing. Sheriff blamed the City for doing too little to fight the social vices in his area.

E

The court granted the People's motion on each of the three causes of action in August 2019. Citing the public nuisance and the drug house laws, the court reviewed the evidence of drug sales in and around Holiday. The court rejected Holiday's arguments that nothing showed drug dealing was inside the liquor store or that Holiday employees did not know about the transactions. It concluded Holiday had no defense to these first

10

two counts and no material facts were in dispute. The court also ruled the evidence established a violation of the unfair competition law. The court would consider injunctive relief later.

Having established Holiday's liability for every count of the People's complaint, the trial court embarked on an additional and alternative analysis of nuisance based on gang-related activity at Holiday. As we affirm the judgment on the trial court's first analysis of drug activity, we need not and do not devote further attention to this alternative theory.

The following year, in September 2020, the court entered final judgment and a permanent injunction requiring Holiday to take remedial measures, including the hiring of guards, a restriction of operating hours, and an end to single-serving sales of alcohol.

The injunction required Holiday to station at least two armed guards between 2 p.m. and Holiday's closing time. The court commanded Holiday to be closed between midnight and 6 a.m. "Do not offer for sale any single serve alcoholic beverages . . . including containers of wine or liquor with less than 25 ounces, and containers of beer with less than 41 ounces. This prohibition does not apply to alcoholic drinks packaged together (such as six-packs of beer)."

The injunction included other provisions. As Holiday concedes in reply, its opening brief did not challenge the injunction's parameters. We return to this point below and conclude Holiday forfeited these attacks.

II

We summarize our analysis. The People established the three elements of a drug house claim premised on the combined

fault of third parties and the property owner: they proved third parties used Holiday for sales of illegal drugs, that Sheriff should have known it, and that he failed to do what a reasonable person would have done, which was to adopt reasonable measures recommended by police to combat this illegal activity. We affirm because Sheriff failed to raise a material issue of fact on these elements. We do not reach the alternative ground about a gang-related nuisance. Sheriff appeals evidentiary rulings that do not affect this analysis. Because these rulings are legally inconsequential, we do not pursue them.

We independently review the summary judgment ruling. (See *People ex rel. Trutanich v. Joseph* (2012) 204 Cal.App.4th 1512, 1520 (*Joseph*) [standard of review]; see also *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1081 [summary judgment can resolve nuisance claims].)

A

The doctrine of public nuisance is ancient, wide-ranging, active, and vague.

This doctrine is ancient. It is rooted in the time of Edward III, who reigned from 1327 to 1377. (Rest.2d Torts, § 821B, com. a.)

The doctrine is wide-ranging.

A scholar asked, "Why is making obscene telephone calls like laying manure in the street? Answer: in the same way as importing Irish cattle is like building a thatched house in the borough of Blandford Forum; and as digging up the wall of a church is like helping a homicidal maniac to escape from Broadmoor . . . . All are, or at some time have been said to be, a common (alias public) nuisance." (Kendrick, *The Perils and Promise of Public Nuisance* (2023) 132 Yale L.J. 702, 705

(*Kendrick*), quoting Spencer, *Public Nuisance—A Critical Examination* (1989) 48 Cambridge L.J. 55, 55.)

California courts acknowledge the doctrine is wide-ranging. "The common law recognized various types of wrongful activity as indictable public nuisances, including such miscellaneous acts as eavesdropping, being a common scold and maintaining for hire a place of amusement which served no useful purpose." (*People v. Lim* (1941) 18 Cal.2d 872, 877 (*Lim*).)

This ancient and wide-ranging doctrine remains active—and controversial—in our era. In the 1990s, for instance, 50 states used the doctrine to attack the tobacco industry, culminating in settlements of over $200 billion. (*Kendrick, supra,* at p. 724.) In 2017, 10 California counties used the doctrine to prevail against lead paint manufacturers. (*Id.* at p. 725; see *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 79–168.) To varying effect, a raft of litigants has used the doctrine against the opioid industry. Some suits resulted in massive settlements. (*Kendrick, supra,* at pp. 733–734.) Other suits encountered adverse court rulings. (*Ibid.*; see, e.g., *People v. Purdue Pharma L.P.* (Super. Ct. Orange County, 2021, No. 30-2014-00725287-CU-BT-CXC) 2021 WL 7186146.) The Supreme Court of Oklahoma, for instance, refused to extend Oklahoma public nuisance law to the opioid context. (*State ex rel. Hunter v. Johnson & Johnson* (Okla. 2021) 499 P.3d 719, 730.)

The controversy continues, as public nuisance cases progress and debate on the merits continues. (E.g., *Kendrick, supra,* at pp. 725–727, 736–791 [identifying cases and defending utility and legitimacy of public nuisance doctrine]; Sharkey, *Public Nuisance As Modern Business Tort: A New Unified Framework For Liability For Economic Harms* (2021) 70 DePaul

L.Rev. 431, 432 [public nuisance cause of action now is "front and center in the most vexing legal controversies of our time: " global climate change, e-cigarettes, COVID-19 harms, and opioid crisis].)

The doctrine is vague.  California law reflects this turbulence and uncertainty over the boundaries of public nuisance law.

" 'Nuisance' is a term which does not have a fixed content either at common law or at the present time." (*Lim*, *supra*, 18 Cal.2d at p. 880.)

The *Lim* court ruled a district attorney stated a proper cause of action for public nuisance, but that holding hardly defined the elements with precision:  "The complaint alleges that the gambling house operated by defendants 'draws together great numbers of disorderly persons, disturbs the public peace, brings together idle persons and cultivates dissolute habits among them, creates traffic and fire hazards, and is thereby injurious to health, indecent and offensive to the senses and impairs the free enjoyment of life and property.' " (*Lim*, *supra*, 18 Cal.2d at p. 882.)

This pleading, which the *Lim* opinion approved, seems more from Dickens than Witkin.

In some respects, however, legislatures have made common law nuisance more concrete.

"Although public nuisance was a common-law claim, by the middle of the twentieth century, most, if not all, state legislatures had passed general public-nuisance statutes, which essentially provided a statutory basis for actions that had always proceeded at common law.  States also enacted statutes designating

14

particular things or activities as public nuisances." (*Kendrick, supra*, at p. 721, fns. omitted.)

Meshing with this pattern, California long ago enacted a general public nuisance statute. This statute is the basis for one cause of action in this case. We quote this general nuisance statute, as amended:

"*Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances*, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, *is a nuisance*." (Civ. Code, § 3479, italics added (Section 3479 or the general nuisance statute).)

In 1972, the Legislature supplemented this general nuisance statute with a special provision exclusively focused on drugs: the drug house law. "*Every building or place used for the purpose of unlawfully selling*, serving, storing, keeping, manufacturing, or giving away any *controlled substance*, precursor, or analog specified in this division, and every building or place wherein or upon which those acts take place, *is a nuisance which shall be enjoined*, abated, and prevented, and for which damages may be recovered, whether it is a public or private nuisance." (Health & Saf. Code, § 11570, italics added (Section 11570, or the drug house law, or the more specific nuisance statute).)

This more specific nuisance statute is the basis for another cause of action in this case. For our purposes, the more specific statute dominates the general nuisance statute, for a violation of

15

the former is a violation of the latter.  (*Joseph*, *supra*, 204 Cal.App.4th at p. 1524.)

This factor thus boils these two claims to one.

This is not the end of the boiling, in fact, for all *three* claims in this case boil down to one.  The People based their third cause of action on the unfair competition law.  (See Bus. & Prof. Code, § 17200.)  The People assert a nuisance showing automatically triggers liability under this law.  Holiday apparently agrees; it declines to give independent treatment to the unfair competition law.  Following the parties, we tarry no further on the unfair competition law.

Given this result—that this case turns *only* on California's drug house statute—we focus on that statute.

This drug house statute is scarcely unusual.  A drug house is a problem property.  Problem properties are a "classic" target of public nuisance law.  (*Kendrick*, *supra*, at p. 723.)  Unlike some modern applications of the public nuisance doctrine, the core effort here thus is traditional rather than adventuresome.

For current purposes, a vital aspect of public nuisance law is that, under certain conditions, it can make a possessor of property liable for failing to act to reduce the risk of harm that *third parties* pose to the community.

The American Law Institute spelled out the conditions for liability:

"A possessor of land upon which a *third person* carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and [¶] (a) the possessor *knows or has reason to know* that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, *and* [¶] (b) he consents to the activity or

16

*fails to exercise reasonable care* to prevent the nuisance." (Rest.2d Torts § 838, italics added, quoted in *Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1283 (*Benetatos*).)

The just-cited *Benetatos* decision was a public nuisance case illustrating this third-party point. That prosecution targeted a fast-food restaurant that had been the subject of dozens of police calls for assault, battery, public drinking, drug offenses, prostitution, pimping, and homicides. (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1284.) The people committing these offenses were not owners or employees of the restaurant, but rather the third parties at or around it.

The source of the *restaurant's* liability was the way it conducted its business. It was open 24 hours a day. The restaurant allowed trash and debris to collect throughout the property, which was dilapidated and covered in graffiti. (*Benetatos*, *supra*, 235 Cal.App.4th at pp. 1273 & 1283–1284.) People were drinking alcohol and loitering on the property, and there was gang activity as well. (*Id.* at p. 1284.) Police told the owners about the problems and suggested voluntary mitigation measures, but the owners were uncooperative, "stating that all criminal issues associated with the property are a police matter." (*Id.* at p. 1273.)

The *Benetatos* opinion validated a public nuisance injunction against the restaurant. *Benetatos* applied the Los Angeles Municipal Code, but the decision also invoked the same general nuisance statute, section 3479, that is involved in this case. (See *Benetatos*, *supra*, 235 Cal.App.4th at p. 1282; see also *id.* at pp. 1284–1285 [citing and applying general nuisance law, including out-of-state cases].)

17

As noted, and of crucial import, the *Benetatos* court quoted section 838 of the Restatement Second of Torts. This vital quotation bears repeating: " 'A possessor of land upon which a third person carries on an activity that causes a nuisance is subject to liability for the nuisance if it is otherwise actionable, and [¶] (a) the possessor knows or has reason to know that the activity is being carried on and that it is causing or will involve an unreasonable risk of causing the nuisance, and [¶] (b) he consents to the activity or fails to exercise reasonable care to prevent the nuisance.' " (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1283.)

The *Benetatos* decision stated that "the City brought its nuisance abatement proceeding not to hold plaintiffs responsible for the criminal acts of third parties, but to make criminal activity at [the restaurant] less likely through the imposition of operating conditions. [The restaurant owners] assert that they should not be responsible legally for the problems that occur in a high crime area. But there was substantial evidence that [these owners] failed to take steps to ameliorate the situation." (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1284, quotation marks and citation omitted.)

Additionally, the *Benetatos* opinion held the trial court properly rejected the restaurant owners' unsupported claim the cost of the imposed operating conditions would force the restaurant out of business. (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1282.)

*Benetatos* relied on *Lew v. Superior Court* (1993) 20 Cal.App.4th 866, 870–875 (*Lew*) for the rule that a "property owner who fails to take reasonable actions to prevent criminal activity on the owner's property may be subject to nuisance

18

liability if that criminal activity harms the surrounding community." (*Benetatos*, *supra*, 235 Cal.App.4th at pp. 1282–1283.)

*Lew* deserves special attention because its facts, in some respects, resemble this case and because our Supreme Court cited *Lew* with favor. The high court described *Lew* like this: "*Lew v. Superior Court* [1993] 20 Cal.App.4th 866, 870–874 [owner's management of rental property, allowing it to become a haven for drug dealing, subjected the owner to nuisance liability to property's neighbors].)" (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1220, fn. 5.)

In the *Lew* case, the Lews owned an apartment complex that became a public nuisance as a center for urban drug dealing. (*Lew*, *supra*, 20 Cal.App.4th at p. 871.) The drug dealers were not tenants. They operated around as well as on the Lews' property. Drug dealers confronted neighbors and made them afraid to walk near the property. Weekly, the neighbors heard gunshots, fighting, and yelling. The neighbors would not allow their children to play outside. (*Id.* at pp. 869–870.) Many neighbors stated, " 'I often fear for my life day and night. This fear has permeated my home, my life, and my soul.' " (*Id.* at p. 869.)

The Court of Appeal affirmed the Lews' liability to their neighbors. The Lews' inaction had allowed their complex to become like a "drug house." (*Lew*, *supra*, 20 Cal.App.4th at p. 871.) Specifically, the owners failed to hire a live-in manager and to install more secure fencing and a key card gate. (*Id.* at p. 875.)

The basis for the liability was the drug house statute. (*Lew*, *supra*, 20 Cal.App.4th at p. 872.) *Lew* established three

19

elements for a drug house case involving third parties. The plaintiff must prove:

1. Third parties used the defendant's property for sales of illegal drugs;
2. The defendant knew or should have known it; and
3. The defendant failed to do what a reasonable person under similar circumstances would have done. (*Lew*, *supra*, 20 Cal.App.4th at pp. 874–875.)

We stress the correspondence with the twice-quoted Restatement provision. Like *Lew*, we need not take up the question of strict liability or liability without fault due to the nature of the allegations against Holiday. (See *Lew*, *supra*, 20 Cal.App.4th at p. 873.)

## B

Applying this law to this case dictates affirmance. The three causes of action are nominally separate but, as explained, boil down to one: the drug house nuisance statute. On that claim, *Lew* is our lamp.

Under *Lew*, the People met their initial burden.

*Lew*'s first element required the People to show third parties used Holiday's property for the purpose of selling illegal drugs. The People offered a surfeit of proof on that score. The evidence amply showed drug sellers and buyers used Holiday to buy and sell drugs. Their purpose was plain.

Element two required evidence Sheriff knew or should have known of this drug dealing. Mejia declared she repeatedly informed Sheriff of the problem and recommended three mitigation measures Sheriff did not take: hire guards, restrict hours of operation or alcohol sales, and eliminate single-serving sales. This proof satisfied element two.

20

Element three was whether Holiday failed to do what a *reasonable person* under the similar circumstances would have done.  The trial court impliedly found a reasonable person in Sheriff's position would have hired guards, would have closed at midnight, and would have stopped selling single-serving alcohol containers.

As to the first two measures—guards and the midnight closing—the *Benetatos* decision is precedent for requiring these actions at a crime hub.  (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1278.)  This suggests a reasonable business owner would take these steps in response to a rampant crime problem like Holiday's.

Both steps, moreover, are logically related to combatting the type of drug dealing that hovered around Holiday.  Guards can discourage the "near-constant" loitering and the use of hooks police observed.  And limiting store operation to avoid the wee hours makes sense, as it is conventional to believe crime flourishes under the cover of darkness.  Officers testified violent crime at Holiday "tends to occur later at night" and noted no other liquor stores within five miles were open to 2 a.m.

As for the single-serving rule, Levin explained Holiday's sales of cheap containers of alcohol appealed to those loitering near Holiday for the purpose of buying or selling drugs.  The People argued that easy access to low-priced alcohol was a magnet for participants in the drug trade.

This argument makes common sense in the context of this case.  The trial court was right to find impliedly that, as a prima facie matter, a reasonable liquor store owner in this situation would avoid selling cheap single-serving alcohol containers.

We acknowledge the unprecedented character of this ruling: the parties do not identify a case imposing such a restriction. And we recognize that selling anything at a low price is typically a *benefit* for consumers, who always like a bargain. We thus confine our ruling to the circumstances of this case, where the low price of the single alcohol servings was part of a constellation of facts creating the public nuisance.

We turn to Holiday's 11 appellate attacks on the trial court's entry of summary judgment. We treat these 11 attacks one by one.

1

Sheriff claims there is a factual dispute about whether he *knew* drugs were being sold at the store. To summarize our response, the required state of mind is recklessness, not knowledge, and the proof was uncontradicted on this score: police repeatedly told Sheriff there was a drug dealing problem at Holiday. If Sheriff subjectively did not believe them, he at least was on notice of a serious risk, and the fault is his if he decided not to investigate. The undisputed evidence thus showed Sheriff was at least reckless as to whether drug dealers frequently were operating in and around Holiday.

We present our analysis of this vital point in detail.

As noted, *Benetatos* favorably quoted the Restatement Second of Torts, which requires, at minimum, proof of recklessness: if other elements are met, liability attaches to a possessor of land who "knows or *has reason to know*" that the activity that causes a nuisance is being carried on. (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1282, italics added [quoting Rest.2d Torts § 838].)

This "reason to know" standard is recklessness, not knowledge.

According to the esteemed authority of the American Law Institute, the four culpable mental states are purpose, knowledge, recklessness, and negligence. (Model Pen. Code, § 2.02, subd.(2).)

Courts consult these definitions because they offer clarity in a field long plagued by imprecision. A distinguished scholar observed these state-of-mind definitions "dissipated these clouds of confusion with an astute and perspicuous analysis that has been adopted in many states and has infused thinking about mens rea everywhere." (Kadish, *Fifty Years of Criminal Law: An Opinionated Review* (1999) 87 Cal. L.Rev. 943, 952.) "[A]s a result of the [Model Penal] Code, . . . [t]he fog that surrounded centuries of controversy over the requirement of mens rea has been lifted, one hopes, permanently." (*Id*. at p. 981.) The respected Judge Gerard E. Lynch of the Second Circuit Court of Appeals, who is also the Paul J. Kellner Professor of Law at Columbia Law School, wrote that "all criminal law scholars understand [that] the Model Penal Code is one of the great intellectual accomplishments of American legal scholarship of the mid-twentieth century." (Lynch, *Revising the Model Penal Code: Keeping It Real* (2003) 1 Ohio St. J. Crim. L. 219, 219.)

This pathbreaking precision of mental state definitions originated in the criminal context, but the advance was of general utility because many areas of law turn on an actor's state of mind. Previous confusion on this score had not been confined to criminal law. Courts thus employ this guidance in the civil context as well. (E.g., *Bullock v. BankChampaign, N.A.* (2013) 569 U.S. 267, 273–274 [bankruptcy case].)

First introduced in 1962, these definitions have stood the test of time. They have achieved high regard from experts in the field, from every perspective. We seize the advantage of this precise definition of recklessness.

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." (Model Pen. Code, § 2.02, subd. (2)(c).)

Sheriff acted recklessly with respect to whether third parties were selling drugs at Holiday. When police repeatedly tell you this is happening and you ignore them, you are consciously disregarding a substantial and unjustifiable risk that what they are saying is true. That risk involves a gross deviation from the standard of conduct a law-abiding person would have observed in Sheriff's situation.

Holiday points to no evidence creating a factual dispute on this score.

2

Holiday argues it created a material fact issue when Sheriff declared he has taken many measures to combat "social vices," including shifting his closing time from 2 a.m. to midnight, hiring guards for duty from 6 p.m. until midnight, and discontinuing sales of "inexpensive single serve liquors." Sheriff's declaration did not define what he meant by "inexpensive single serve liquors."

24

Sheriff made this declaration in June 2019, but did not specify *when* he took these actions. The People asserted Sheriff largely did not act until after they sued him; Sheriff nowhere attempts to rebut this claim. Nor does he respond to the People's citation of *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 133 for the proposition that "courts have rejected arguments against injunctive relief where defendants changed their practices only in response to being sued." Sheriff's tardy and partial compliance did not create a material issue of fact.

Sheriff's declaration identifies two police recommendations he frankly *refused* to implement: "the number of hours to engage private security guards, and the size (contents) of liquor and beers sold to patrons at certain hours."

These disagreements between Sheriff and the People raise a key legal question: what actions would a reasonable person in Sheriff's shoes take? Sheriff repeats variants of this same issue in later portions of his opening brief concerning "reasonable actions," the "balancing of the inconveniences," and whether interests of third parties and the general public support the injunction.

As detailed above, the People enjoyed prima facie support for the type of public safety measures they demanded: that Holiday close at midnight or stop selling alcohol at this point, hire licensed security guards, and stop selling single-serving alcohol containers.

Once the People established this prima facie support for their safety proposals, it was Sheriff's burden to respond that the cost of full compliance would be socially irrational: that the social burden of the People's prima facie reasonable proposals would outweigh their social benefit.

25

This balancing of social benefits and burdens is familiar in the law.  (E.g., *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1025, [no duty of reasonable care when the avoidance of social harm is burdensome and the social utility of the activity is great]; *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1150, 1153, [no duty of reasonable care where the social benefit of the activity concerned is so great, and avoidance of danger so burdensome to society, as to outweigh the value of negligence liability]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 473–475, [determine duty of reasonable care by conducting a "social utility analysis" that weighs the benefits of proposed safety measures against their burdens]; *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 123–124 [duty of reasonable care arose because defendant "easily" could have undertaken the proposed safety measure].)

These venerable tort principles are relevant to the law of public nuisance.  (See Rest.2d Torts, § 821B, com. b,[nuisance is a tort].)

Sheriff offered neither argument nor evidence to suggest the extent of the measures the trial court ordered are unduly burdensome from a social perspective.  Courts recognize there may be circumstances where the hiring of security guards will be required to satisfy a duty of care, but this action will rarely, if ever, be found to be a minimal burden, for the monetary cost of security guards is not insignificant.  (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 238.)  We agree with the trial court that, on this record, the guard order was proper.

Sheriff agreed to some guards, to some limitations on single servings of alcohol, and to an earlier closing time.  He balked, however, on two specific points.  The injunction required two

26

armed guards between 2 p.m. and closing time, and it forbade sales of single serve "containers of wine or liquor with less than 25 ounces, and containers of beer with less than 41 ounces." Sheriff disagreed with "the number of hours to engage the private security guards, and the size (contents) of liquor and beers sold to patrons at certain hours."

Holiday faces a fatal problem at this point. It attempted to draw two specific lines, but it did not defend these lines with specificity.

What are the guard hours Holiday believes are proper? We infer Sheriff must believe guards were unnecessary from 2 p.m. to 6 p.m., or that their benefit during that interval would not outweigh their cost. But why?

And what is the proper minimum container size Holiday advocates? What is the concrete significance of these details?

Holiday's opening appellate brief elides these points, which is a fatal omission.

Rather, Holiday argues abstractly that Holiday benefits the community by providing goods for sale and by supporting community wellbeing. These points do not meet the merits of the argument.

In sum, the People presented evidence of frequent drug dealing and of an attendant and serious history of violent crime. This evidence shifted the burden to Holiday to illustrate how the measures it refused to take would be more burdensome than beneficial from a social standpoint. Holiday has not attempted this showing. As a matter of law, then, Sheriff's arguments on this score fail to unhorse the judgment.

3

Sheriff argues, incorrectly, that five witnesses created disputed fact issues by testifying to what they did and did not see. A logical flaw destroys these arguments. Two people can look at the same thing, but what they see may differ if they look at different times. The observations are different but not in conflict.

Hypotheticals illustrate this basic point. Suppose Maria sees a game at the stadium on Monday, but Chris goes there Tuesday and sees no game. The two observations do not conflict. Unless a place is as static as a fly in amber, people visiting at different times can see different events. And, if they are looking in different directions, people even in the same place at the same time see different things. Two may be outside at night; one may see the shooting star the other misses entirely. Unless people are looking at exactly the same thing at the same time, differences in what they notice do not create a conflict about what happened.

Sheriff makes five mistaken arguments of this kind.

First, Sheriff cites Garcia's testimony that *Garcia* did not personally see drug dealing *inside* Holiday. Levin, however, did. Garcia's testimony is consistent with Levin's because Holiday has not established the two watched at the same time. There is no factual conflict.

Second, one Vanessa Mackenzie stated she has not "in recent times" had problems with Holiday. She believes Sheriff "has been doing his best to reduce the vices in the community." Mackenzie does not explain whether, how often, or when she visited Holiday. This lack of foundation means her declaration cannot create a disputed issue. A limited picture of Holiday does not impeach or contradict the observations of others at different times.

Third, Steven Meeks, a longtime resident of the neighborhood who has known Sheriff for eight years, testified Sheriff is a "responsible businessman and I have not had any issues the few times I patronized Holiday Liquor store." Meeks did not mention whether he saw drug dealing at Holiday. Nor did Meeks address loitering and violent crime that did not involve him. More generally, someone who has patronized Holiday only a few times in eight years cannot create a disputed issue of material fact about the typical situation at Holiday or about events there at other times.

Fourth, Eva Aubry, another longtime neighborhood resident and customer of Holiday who visits it once a week, testified "I have not had any problems when I patronize the store. Mr. Sheriff and Holiday Liquor are not the sources of the current problem." Like Meeks, Aubry refrained from commenting on drug dealing or loitering. She likewise did not mention, one way or another, crime that victimized others but not her.

Fifth, Marcia Lewis declared she lives about three blocks from Holiday and she and her family have for more than 25 years been patronizing Holiday, which is the closest convenience store to her home. Lewis has known Sheriff for four years. "Mr. Sheriff has treated me and my mother very respectfully when we patronize the store."

Lewis testified a nearby homelessness encampment is a neighborhood problem, and that there were a few occasions when homeless people were rude to her when she was buying gas a block away from Holiday. "I have not had any such experience at or around Holiday Liquor."

"I have other family members, friends and neighbors that I know who go to Holiday Liquor on a regular basis. I have never

been told by any of these people that they felt harassed, intimidated, or unsafe while at or near Holiday Liquor. I can attest that if I was aware that Holiday Liquor was a gang infested business, a hangout place for gang members, or a place accommodating of gang activities, I would not patronize the store, and I would not allow my aged mother to patronize the store."

The People correctly respond that this statement, like the others from neighbors and patrons, is not "relevant to whether the drug transactions identified by the LAPD occurred."

4

Holiday maintains the evidence showed drug dealing only *outside* the store, with no evidence of drugs within the store itself. This argument falters, however, because a property owner can be liable for creating a public nuisance near *but not on* the owner's property. (See *Lew*, *supra*, 20 Cal.App.4th at pp. 872–873 [acts injurious to the plaintiffs "were committed off petitioners' property"].) And Levin testified illegal drugs were sold both inside and outside the store.

5

Holiday maintains a fact issue arose because Levin never saw Sheriff himself "actively involved in the sales of narcotics." This argument is incorrect because the drug house statute does not make liability hinge on whether the owner *personally* dealt drugs. (*Lew*, *supra*, 20 Cal.App.4th at p. 871.) The trial court ruled Holiday's business practices fostered drug dealing by third parties, not that Sheriff sold drugs.

6

Holiday cites a passage in the People's summary judgment reply brief in the trial court. This passage asserted the criminal activity causing this nuisance is not committed by the homeless

but rather by gang members.  Holiday insists there is a conflict, because elsewhere police admitted there *is* a "nexus between homeless[ness] in [Holiday's] neighborhood and narcotic transactions."  This "nexus" does not present a material issue, for a *Lew* claim does not turn on whether the drug dealing involves the homeless.  The relevant fact is drug dealing.  Whether drug buyers have homes is immaterial.  (See *Lew*, *supra*, 20 Cal.App.4th at pp. 870–875 [no mention of status of drug customers].)

7

Holiday argues its corrective action and changed circumstances merit dissolving the injunction.  There is no indication Holiday moved for this relief or sought to modify the injunction at the trial court.  (See Code Civ. Proc., § 533.)

8

Holiday contends a statute immunizes it against public nuisance charges because Holiday passed undercover police tests proving it did not sell alcohol to an intoxicated person or minors.  (See Civ. Code, § 3482 ["Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."].)  For section 3482 immunity to apply, however, "the specific action causing the nuisance must be unequivocally authorized by statute."  (*Citizens for Odor Nuisance Abatement v. City of San Diego* (2017) 8 Cal.App.5th 350, 359, fn. 8.)  Here, a statute deems the narcotics activity a nuisance.  The store's alcohol license is not relevant.

9

Holiday maintains it was a miscarriage of justice for the trial court to have granted the People's summary judgment motion, but its three-sentence presentation of this point is so

scanty as to forfeit the argument. (See *Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942–943.)

10

Holiday devotes many pages of its reply brief to the injunction's scope but concedes it did not raise these issues in its opening brief. Holiday forfeited these attacks. (See *Dieckmeyer v. Redevelopment Agency of Huntington Beach* (2005) 127 Cal.App.4th 248, 260.)

11

Holiday argues the trial court erred by excluding certain evidence. The excluded evidence consists of three police department letters explaining Holiday did not sell alcohol to underage or intoxicated decoys; statements by store witnesses that Holiday passed those tests; a statement by Sheriff that there have been no shootings inside the store; and another statement by Sheriff that unnamed police officers at some point "commended [his] cooperation in their investigative and enforcement actions in the area." Holiday's opening brief did not explain how admitting this evidence would have made any difference regarding the drug house claim. We need not and do not resolve whether the trial court erred in excluding this evidence. (*See Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323, 337 [party challenging exclusion of evidence at summary judgment must establish prejudice].)

C

We deny Holiday's request for judicial notice. Holiday moved for judicial notice of Los Angeles crime data and of deposition transcript excerpts. Its motion did not explain why

32

Holiday neglected to provide this evidence to the trial court or why it waited until its appellate reply brief was due to seek judicial notice.  The reply brief and the motion fail to say how the belated evidence merits reversing the trial court's drug house ruling.

## DISPOSITION

We affirm and order appellants to pay costs.


WILEY, J.


We concur:


STRATTON, P. J.


VIRAMONTES, J.